UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION

No.9:15-cv-80073-Rosenberg/Hopkins

ADT LLC, and ADT US HOLDINGS, INC.,

    Plaintiffs,

        v.                          **JURY TRIAL DEMANDED**

ALARM PROTECTION LLC, ALARM
PROTECTION MANAGEMENT LLC, ALARM
PROTECTION ALABAMA LLC, ALARM
PROTECTION CALIFORNIA LLC, ALARM
PROTECTION FLORIDA LLC, ALARM
PROTECTION GEORGIA LLC, ALARM
PROTECTION MISSISSIPPI LLC, ALARM
PROTECTION TENNESSEE LLC, ALARM
PROTECTION TEXAS LLC, ALARM
PROTECTION ALASKA LLC, ALARM
PROTECTION ARKANSAS LLC, ALARM
PROTECTION KENTUCKY LLC, ALARM
PROTECTION OHIO LLC, ALARM
PROTECTION OKLAHOMA LLC, ALARM
PROTECTION SOUTH CAROLINA LLC,
ALARM PROTECTION TECHNOLOGY LLC,
ALDER HOLDINGS, LLC, RHODESIAN
PROTECTION LLC, BOERBOEL PROTECTION
LLC, and ADAM D. SCHANZ,

    Defendants.

_____/

**THIRD AMENDED COMPLAINT**

      Plaintiffs ADT US HOLDINGS, INC., and ADT LLC (together, "ADT"), through

undersigned counsel, bring this action for damages and injunctive relief against

Defendants Adam D. Schanz ("Schanz"), Alarm Protection Florida, LLC ("AP Florida"),

Alarm Protection Alabama, LLC ("AP Alabama"), Alarm Protection Alaska, LLC ("AP

Alaska"), Alarm Protection Arkansas, LLC ("AP Arkansas"), Alarm Protection

California, LLC ("AP California"), Alarm Protection Georgia, LLC ("AP Georgia"),

Alarm Protection Kentucky, LLC ("AP Kentucky"), Alarm Protection Mississippi, LLC

("AP Mississippi"), Alarm Protection Ohio, LLC ("AP Ohio"), Alarm Protection

Oklahoma, LLC ("AP Oklahoma"), Alarm Protection South Carolina, LLC ("AP South

Carolina"), Alarm Protection Tennessee, LLC ("AP Tennessee"), Alarm Protection

Texas, LLC ("AP Texas"), Alarm Protection, LLC ("AP LLC"), Alarm Protection

Technology, LLC ("APT LLC"), Alarm Protection Management, LLC ("Management"),

Rhodesian Protection LLC ("Rhodesian"), Boerboel Protection LLC ("Boerboel"), and

Alder Holdings, LLC, collectively doing business as Alder (together, "Alder," "AP" or

"defendants") and in support allege:

## SUMMARY OF THE CASE

1.      This is an action for damages, attorney fees and injunctive relief arising

from Alder's deceptive sales practices.  Alder competes with ADT, selling residential

alarm systems door-to-door to ADT's customers.  Alder trains its sales agents to use false

sales pitches that mislead ADT's customers into believing that the agents represent ADT,

or that they are otherwise affiliated with ADT, and that they are visiting to install new

ADT alarm equipment when in fact they have no ADT affiliation.  This initial deception

confuses ADT's customers at their doorsteps, winning their interest and trust, in a

calculated effort to gain access to the customers' homes and install new Alder equipment

in the guise of an "upgrade."  Once inside, the agents sign ADT's customers to new five-

year contracts with Alder.  These practices violate Section 43(a) of the Lanham Act, 15

U.S.C. § 1125(a), the Florida Deceptive and Unfair Trade Practices Act, and ADT's

common-law rights against unfair competition.  ADT seeks an injunction barring further use of deceptive sales tactics by these defendants, the recovery of ADT's damages, the recovery of defendants' profits, punitive damages, and ADT's costs and attorney fees incurred in this lawsuit.

## PARTIES

2.      Plaintiff ADT US Holdings, Inc., is a Delaware corporation with its principal place of business at 1501 Yamato Road, Boca Raton, Florida 33431.  ADT US Holdings is a holding company that owns, *inter alia*, all ADT trademarks, including without limitation 21 ADT live word trademarks featuring the letters "A – D – T," registered in the United States Patent & Trademark Office that bear the registration numbers 3251836, 3352491, 710708, 710507, 3515266, 3511263, 3445423, 3909665, 3485321, 3421797, 1034716, 838956, 803247, 846966, 3348663, 3253804, 3445420, 3991449, 3335239, 3335298, and 3427081 ("ADT Trademarks").  ADT US Holdings is ultimately wholly owned by Apollo Global Management LLC, a public corporation traded on the New York Stock Exchange.

3.      Plaintiff ADT LLC is a Delaware limited liability company with its principal place of business at 1501 Yamato Road, Boca Raton, Florida 33431.  ADT LLC is an operating company that runs the ADT alarm services business in the United States. ADT LLC uses the ADT Trademarks under license from ADT US Holdings.  ADT LLC is owned by ADT US Holdings, Inc.

4.      Defendants AP Florida, AP Alabama, AP Alaska, AP Arkansas, AP California, AP Georgia, AP Kentucky, AP Mississippi, AP Ohio, AP Oklahoma, AP South Carolina, AP Tennessee, AP Texas, AP LLC, and AP Holdings (together, "AP

Defendants") are each limited liability companies organized under the laws of Utah, each organized and created by defendant Adam Schanz.  Each of the AP Defendants maintains offices at 450 North 1500 West, Orem, Utah 84057.  Each has designated as its agent for service of process Corporation Service Company, 10 E. South Temple, Suite 850, Salt Lake City, Utah 84133.  Upon information and belief, each of these company defendants adopted the trade name "Alder" in early 2015.

5.      Defendant Alder Holdings is a Utah limited liability operating company that, beginning in early 2015, sells, installs, and services alarm accounts.  Alder Holdings operates in Alabama, Alaska, Arizona, Arkansas, Connecticut, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Missouri, New Mexico, Ohio, Oklahoma, South Carolina, Tennessee, Texas and Utah. Alder Holdings is registered as a foreign limited liability company in Florida with the Florida Department of State, Division of Corporations.  Alder Holdings has sales offices and sales agents in Florida, and holds business licenses to sell alarm systems in Florida.  ADT has received complaints in 2015 and 2016 from ADT customers in Pensacola, Belle Glade, Lauderdale Lake, Lehigh Acres, and Miami about false sales pitches by Alder Holdings sales agents at their homes in Florida.

6.      On paper, at least, the "Alder" enterprise is a complex legal structure, with no fewer than 58 different companies, that in practice are used to operate a simple alarm company owned and controlled by defendant Schanz.  ADT is taking discovery to determine the claimed functions of these various entities.  Defendants AP LLC, APT LLC, Management, Rhodesian, and Boerboel are each limited liability companies organized under the laws of Utah and were organized and created by Schanz.  Except for

Management (whose function is not apparent), these defendants appear to be members of Alder Holdings and the AP Defendants, and maintain offices at 450 North 1500 West, Orem, Utah 84057.  Each has designated as its agent for service of process Corporation Service Company, 10 E. South Temple, Suite 850, Salt Lake City, Utah 84133.  On information and belief, these companies do not serve as traditional holding companies. For example, APT LLC appears to be the company through which all cash and obligations run for the AP Defendants. On information and belief, all of these structures – Alder Holdings, the AP Defendants, AP LLC, APT LLC, Rhodesian, and Boerboel are all paper entities that are operated in practice in disregard of the separate corporate entities, and that were created to avoid obligations to creditors.

7.     Defendant AP Florida also remains active in Florida and is registered to do business in Florida as a limited liability company with the Florida Department of State, Division of Corporations.  Defendants, directly or through AP Florida, or Alder Holdings, have misled Florida consumers and engaged in the deceptive sales practices that are the subject of this civil action.

8.     Defendant Adam Schanz is a resident of the State of Utah.  Schanz is the manager and the ultimate owner of each of the other defendants.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to section 1331 of title 28 because it presents a Federal question under Section 43 of the Lanham Act.

10.     This Court has supplemental jurisdiction over the state-law claims also asserted in this action pursuant to section 1367(a) of title 28.

11.     Venue lies in this District pursuant to section 1391(b) of title 28 because defendants reside or are otherwise found in this District, and because a substantial number of the events giving rise to the claims asserted in this Complaint occurred in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

12.     ADT, founded in 1874, is the oldest, largest and best-known provider of electronic security services and equipment for homes and businesses in the United States.

13.     ADT provides security services and equipment nationwide and is engaged in interstate commerce for the purposes of the Lanham Act.

14.     ADT's name and trademarks are registered with the United States Patent and Trademark Office.

15.     Defendant Adam Schanz has worked in the security systems industry for most of his adult life, in Florida and elsewhere.  Schanz's experience made him aware of ADT in the security systems market.

16.     In 2008, Schanz decided to form an alarm company.   On December 30, 2008, Schanz filed articles of organization for Alarm Protection Technology LLC with the Utah Department of Commerce and made himself manager of the company.  Schanz then created various state-specific "Alarm Protection Technology" entities for the states in which Schanz expected to conduct business.   One of these entities was APT Florida, which was formed in 2011.   Schanz operated the companies under the abbreviation "APT" as part of his ongoing effort, which continues today, to sell alarm systems to ADT's customers by confusing them as to his companies' seeming (but false) affiliation with ADT.

17.     In December 2011, Schanz organized "APT Holdings LLC" and made himself its sole member and manager.  Schanz then transferred, without consideration, his membership interests in each of the Alarm Protection Technology entities, including APT Florida, to Holdings.

18.     In 2013, in response to a preliminary injunction entered by this Court that forbade the use of the "APT" acronym, Schanz reorganized his alarm sales operation under the "Alarm Protection" name, forming "Alarm Protection entities that mirrored the old Alarm Protection Technology entities, including the AP Defendants.  From February to April 2013, the Alarm Protection Technology entities stopped selling alarms and Alarm Protection started selling alarm accounts.

19.     The sole member and manager of each of the AP Defendants is defendant Rhodesian Protection, LLC.  From March 2013 until April 2015, Schanz was the CEO, the only member, and the manager of Rhodesian Protection.  Through Schanz's ownership and control of Rhodesian Protection, Schanz maintains complete control over the AP Defendants.

20.     In April 2015, Schanz transferred his membership interest in Rhodesian Protection to defendant APT LLC, which also owns the APT entities.  The transfer of Rhodesian to APT LLC does not affect Schanz's control over Rhodesian, or by extension over the AP Defendants that Rhodesian owns, because Schanz also owns and manages APT LLC.  In fact, Schanz ultimately owns and controls each and every defendant, and their predecessors and affiliates, set forth in this Complaint.

21.     Far from creating a network of entities with distinct legal identities, Defendant Schanz at all times operated the APT/AP business as a single enterprise.

Schanz created and operated the complex AP corporate structure to mislead, and avoid any meaningful accountability to, regulators and creditors.  In theory, Management provided support to the various AP companies, and AP LLC sold alarm systems only to customers in the state of Utah.  In fact, Management appeared to have little function, if any.  All cash was run through AP LLC, not through Management or the individual AP companies.  All bank accounts were held in AP LLC's name, not by any of the individual AP companies.  All vendor relationships were with AP LLC, not with Management, and not with any of the individual AP companies.  AP employees and sales agents often contracted to work for one AP entity, then worked for others without regard to corporate distinctions.

22.     The AP companies, to the extent they had any separate existence at all, existed solely to funnel customers to AP LLC and, through AP LLC, to Schanz.  At all times material to this case, Defendant Schanz ignored the separate existences of the various AP entities, and operated them all as his direct agents and alter egos.

23.     In 2015, there was another reorganization of operations – this time, under the "Alder" name.  Schanz formed defendant Alder Holdings in January 2015 and is the manager of that entity.  Alder Holdings has one member, defendant Boerboel Protection, LLC, and Schanz is the sole member and manager of Boerboel.  As the manager of Alder Holdings, and as the owner and manager of Alder Holdings' sole member, Schanz has complete control over Alder Holdings.

24.     Since February 2015, Schanz has operated the AP companies under the Alder trade name.  The name change did not alter Schanz's complete control of the AP enterprise, or the manner in which it operates.

25.     Starting in April 2015, the AP Defendants sold alarm accounts on behalf of Alder Holdings.  At some time between April and December 2015, Schanz moved the operations of each of the AP Defendants to Alder Holdings.  The AP Defendants stopped selling alarm accounts in their respective states, and Alder Holdings started directly selling alarm accounts in the AP Defendants' respective states, using the AP Defendants' assets and sales agents.  As of the Spring of 2015, Alder Holdings was already selling alarm accounts in Florida, Texas, Alaska, Utah, Mississippi, Alabama, Georgia, Tennessee and Kentucky.

26.     Schanz ultimately moved all of the AP Defendants' functions relating to the AP alarm sales business – *inter alia* all payroll, accounting, billing and customer service functions – to Alder Holdings.  Schanz also moved all AP functions relating to AP's sales agents – their training, their commissions, and their management – to Alder Holdings.  Those sales agents then became Alder agents, and sold alarms for Alder.

27.     By January 1, 2016, Schanz had migrated the entire AP alarm business from the AP Defendants to Alder Holdings.  All the AP Defendants ceased selling alarm accounts as of January 1, 2016, though the AP Defendants continue to hold the alarm accounts that each previously generated.  Alder Holdings is currently the only entity selling alarm accounts.  Alder provides all operational support to the AP Defendants, including *inter alia* providing them with alarm monitoring services, collecting alarm subscription payments, and providing customer service and repairs, for all of the alarm accounts held by the AP Defendants.

28.     Alder and ADT are direct competitors in the security systems markets. ADT and AP market and sell substantially similar goods made by the same suppliers

through the same channels to the same target markets of residential consumers.  The companies also provide substantially similar security monitoring services to their respective customers.  ADT operates in each of the states in which defendants sell alarm systems.

29.     None of the defendant entities has any separate existence apart from Schanz and the Alder enterprise he owns and controls. Each exists solely to generate sales for Schanz.  AP Florida, for example, has never transacted business for any entities other than Schanz and AP LLC.  AP Florida has never marketed the products or services of companies other than AP or Alder.  AP Florida had no salaried employees.  AP Florida relied upon AP LLC (and, now, Alder) for its administrative and operational functions, and for its marketing, customer support, and customer communications functions.  AP Florida appeared to have no office in Florida.  On information and belief, Schanz operates each of the other defendants in the same manner.

30.     On information and belief, each of the AP Defendants other than AP LLC is inadequately capitalized.  Their sales revenues were deposited into bank accounts owned or controlled by AP LLC.  Their commissions owed to sales agents were paid from those same AP LLC accounts.  Since 2016, all cash runs through Alder, not AP LLC.

31.     On information and belief, Schanz kept cashflows and bank accounts out of the reach of the AP sales companies so as to insulate them against judgments from creditors who might sue them.  Nor did any of the AP companies maintain any meaningful presence in the states in which each was active, apart from bases to supply and support their sales agents' efforts.  For example, AP Florida kept a local presence in

Delray Beach, but closed it once AP stopped marketing AP alarm systems to new customers.  On information and belief, Schanz operated each of the other AP Defendants in the same manner.

32.     Schanz operated the AP Defendants as mere instrumentalities.  Through the AP sales companies, Schanz deployed a sales force comprised entirely of "independent contractors" supposedly beyond AP's control, to achieve Schanz's illegal purpose of acquiring new customers through the use of deceptive sales tactics in disregard of the Lanham Act and state law, without any legal consequence to Schanz.  To the extent they may be said to exist at all in practice, each of the AP Defendants has at all times acted in active concert with Schanz to confuse consumers in violation of the Lanham Act.

33.     Defendants target ADT customers by seeking houses with the distinctive ADT sign that ADT's customers post on their premises to deter burglars and trespassers. Defendants' sales agents solicit those ADT customers in unannounced "cold" sales visits to the customers' homes.  At the beginning of these visits, the agents use deceptive sales pitches that are intended to mislead (and that do mislead) ADT's customers into believing that defendants represent ADT, or that they are affiliated with ADT, or that they are visiting at ADT's direction, or that they work for the companies (*e.g.*, GE) that made the ADT alarm equipment installed in the customers' homes.  Defendants' agents use these pitches to induce ADT customers to believe that they have an existing business relationship with the agents, to trust them, and to grant the agents entry into their homes. Once inside, having won the customers' trust by this initial confusion, the agents lead the customers to sign Alder contracts and install Alder systems in the mistaken belief that

they are receiving new ADT equipment as an "upgrade" of the customers' ADT alarm system.

34.     Defendants' deceptive practices are injuring ADT by causing ADT's customers to listen to their deceptive sales pitches, and, ultimately, to uninstall their ADT alarm systems, replace them with defendants' equipment, terminate the customers' ADT contracts, and have the customers execute new contracts for security services with them.

35.     Defendants, by falsely representing to ADT customers that their ADT alarm systems are outdated and vulnerable to burglars, or are in need of "upgrades," damage ADT's goodwill and reputation as a reliable provider of security services.

36.     As a result of defendants' practices, a number of ADT customers have confused defendants' sales agents with ADT representatives, and as a result have unwittingly found themselves with defendants' alarm systems installed in their homes, and with contractual obligations to both defendants and ADT.  In some instances, ADT has been required to send technicians to the deceived customers' houses to reinstall the removed ADT equipment, at considerable expense to ADT.  In others, the customers retained defendants' systems, and terminated their ADT contracts.

37.     Such practices, as alleged in greater detail below, violate statutory and common-law prohibitions against the use of false and deceptive statements in commerce. They also violate the security systems industry's own Code of Ethics and Standards of Conduct, which requires that companies "truthfully and clearly identify themselves by name … at the initiation of a sales presentation, without request from the consumer," and which prohibits as common deceptive sales practices, *inter alia*, (a) any claim that a competitor is going out of business, (b) any claim that the company is taking over the

competitor's accounts, or (c) any offer of an "update" or "upgrade" of an existing system that requires the execution of a contract with a new security services provider.

38.    In 2014 alone, ADT received over one hundred calls from its customers, many elderly, reporting visits by AP sales agents, and expressing confusion as to whether they are affiliated with ADT.  These customers reported AP's false or misleading sales pitches principally in Alabama, California, Florida, Georgia, Mississippi, Tennessee, and Texas.

39.    The number of affected states has now grown to include Alaska, Arkansas, Kentucky, Ohio, Oklahoma and South Carolina.  The reports have continued unabated in 2015 and 2016.  In twelve months ending June 2016, ADT had received over 200 new reports from its customers of deceptive sales calls by Alder agents.

40.    ADT offers the following examples, each supported by sworn declarations, to illustrate defendants' deceptive and tortious acts.  They show that defendants' agents' false representations of affiliation are confusing customers in the initial stages of the agents' sales presentations, and that ADT's customers are in many instances inviting Alder's agents into their homes in the mistaken belief that the agent is with ADT, their alarm services provider.  Further, some customers report that they remained confused throughout the defendants' agents' sales call, and signed contracts with defendants in the mistaken belief at the point of sale that they were merely signing work orders for the "upgrades" they had received, not new contracts with one of ADT's competitors.

*2014 Customer Complaints*

41.     On February 14, 2014, Claretta Corley, a 74-year-old ADT customer, was visited at her home in Montgomery, Alabama, by an AP agent who falsely told her that AP had "bought out" ADT, and that he was visiting to replace her ADT equipment.  Ms. Corley signed an AP contract based on the fraud.  [DE 5-2.]

42.     On March 19, 2014, Ted Paul, a 72-year-old ADT customer, was visited at his home in Longview, Texas, by an AP agent who identified himself as Chad.  Chad said, in response to Mr. Paul's query, that he was "working with ADT," and was visiting to "upgrade" Mr. Paul's "outdated" equipment.  Mr. Paul was "uncomfortable" with Chad's pitch, told him he would consider the offer, and turned Chad away without signing an AP contract.  [DE 5-3.]

43.     On April 16, 2014, Deborah Jackson, a 56-year-old ADT customer, was visited at her home in Tuskegee, Alabama, by an AP agent who identified himself as Jason.  Jason claimed to be with ADT, and that he was visiting to "check and upgrade" Ms. Jackson's ADT alarm equipment, and tried to push his was into Mr. Jackson's home.  Ms. Jackson refused him entry, then called ADT to find out whether Jason was with ADT.  When Ms. Jackson placed the call, Jason responded that he worked with Alarm Protection, not ADT.  Ms. Jackson reported the incident to the local police.  [DE 5-4.]

44.     On April 21, 2014, Bernice (76) and Walter (77) Christiansen, ADT customers, were visited at her home of Winchester, Tennessee, by an AP agent who identified himself as Damen DeMarcus. Mr. DeMarcus claimed to be visiting to "upgrade" their "outdated" ADT alarm equipment.  Mr. Christiansen understood Mr. DeMarcus to work with ADT, and introduced him to his wife as "Mr. DeMarcus from

ADT," but Mr. DeMarcus did not correct him.  The Christiansens signed an AP contract based on the fraud.  [DE 5-5; DE 5-6.]

45.     On May 1, 2014, Leonard Morgan, an 83-year-old ADT customer, was visited at his home in Meridian, Mississippi, by an AP agent who identified himself as Jacob Dahl, a defendant in the Prior Action who was at the time enjoined in that action from engaging in deceptive sales practices.  Mr. Dahl falsely stated that AP had "taken over" Mr. Morgan's ADT account.  Mr. Dahl did not respond when Mr. Morgan asked if AP had taken over ADT.  Mr. Dahl falsely stated that Mr. Morgan's alarm system had to be replaced because AP was now monitoring Mr. Morgan's alarm service.  Mr. Morgan signed an AP contract based on the fraud.  Mr. Morgan also reports that Mr. Dahl later called ADT and impersonated Mr. Morgan in order to cancel Mr. Morgan's ADT alarm services.  [DE 5-7.]

46.     On May 9, 2014, Paul Mego, a 54-year-old ADT customer, was visited at his home in Jackson, Tennessee, by an AP agent who identified himself as Tom Quinn.  Mr. Quinn claimed that Mr. Mego was on his "list of ADT customers with outdated alarm equipment."  When Mr. Mego asked Mr. Quinn for identification to prove Mr. Quinn's affiliation with ADT, Mr. Quinn claimed not to have identification.  Mr. Mego ordered Mr. Quinn to leave his property.  [DE 5-8.]

47.     On May 12, 2014, Robert Dixon, a 73-year-old ADT customer, was visited at his home in Port Arthur, Texas, by an unknown AP agent who led Mr. Dixon to believe he was from ADT, visiting to "upgrade" Mr. Dixon's ADT alarm system.  Mr. Dixon signed an AP contract based on the fraud, believing it to be required for the upgrade.  After signing the contract, Mr. Dixon noticed that the contract was with AP, not

ADT, ripped up the contract, and refused to let the AP technicians install the AP alarm system.  [DE 5-9.]

48.     On May 12, 2014, Bernice Kirk, a 79-year-old ADT customer, was visited at her home in Port Arthur, Texas, by an unknown AP agent who stated he was visiting to "upgrade" Ms. Kirk's alarm system because her existing system was "old and outdated." The agent did not disclose his AP affiliation until after his technicians had already installed the new AP alarm system in her home.  Ms. Kirk signed the AP contract based on the fraud.  [DE 5-10.]

49.     On May 12, 2014, Henry Alba, a 54-year-old ADT customer, was visited at his home in Glendale, California, by an unknown AP agent.  The AP agent falsely stated that ADT had contracted with AP to install new cordless alarm units from Honeywell.  Mr. Alba signed an AP contract based on the fraud.  [DE 5-11.]

50.     On May 15, 2014, Evelyn Lincoln, an 82-year-old ADT customer, was visited at her home in Lincoln, Tennessee, by an AP agent who identified himself as Ben Quinn.  Mr. Quinn said we was with AP, falsely stated that AP was the manufacturer of Ms. Quinn's ADT alarm equipment, and by the false statement misled Ms. Quinn to believe that AP and ADT were related companies.  Ms. Lincoln signed an AP contract based on the fraud.  [DE 5-12.]

51.     On May 21, 2014, Mae Young, an 88-year-old ADT customer, was visited at her home in Houston, Texas, by an AP agent who identified himself as Wade Young. Mr. Young quickly flashed an ID badge, and stated that he was visiting to "upgrade" Ms. Young's "old" ADT alarm system.  Ms. Young signed an AP contract and permitted the

installation, but rescinded it the following day after her son was able to review the contract and conclude that AP was not affiliated with ADT.  [DE 5-13.]

52.     On May 24, 2014, Eloise Gray, an 84-year-old ADT customer, was visited at her home in Shubuta, Mississippi, by an unidentified AP agent.  The agent led Ms. Gray to believe he was from ADT by stating he was visiting to upgrade her alarm equipment.  After the agent inspected Ms. Gray's ADT equipment, the agent claimed to call ADT to review Ms. Gray's ADT contract.  Ms. Gray signed an AP contract based on the fraud.  [DE 5-14.]

53.     On May 27, 2014, Bobbie Gary, an 82-year-old ADT customer, was visited at her home in Center, Texas, by an unidentified AP agent who falsely stated that AP had bought ADT.  Ms. Gary signed an AP contract based on the fraud.  [DE 5-15.]

54.     On June 2, 2014, Stacia Hoskin, a 41-year old ADT customer, was visited at her home in Cypress, Texas, by an unidentified AP agent who falsely stated that he had been sent to replace the keypad on Ms. Hoskin's ADT alarm system.  The AP agent refused to answer Ms. Hoskin's questions about why he was not driving an ADT work truck, or why ADT had not given her advance notice of his visit.  The AP agent gave Ms. Hoskin his business card when she demanded it, saw the AP trademark, and ended the conversation.  [DE 5-16.]

55.     On June 4, 2014, Dessie Johnson, a 78-year-old ADT customer, was visited at her home in Huntsville, Alabama, by an AP agent who identified himself as Jeff Pugmire.  Mr. Pugmire falsely stated he was "with ADT," and falsely stated that he was sent by ADT to "put in your new system."  Ms. Johnson refused to permit the upgrade, despite Mr. Pugmire's hour-long effort to persuade her.  The following day, Mr. Pugmire

again visited Ms. Johnson's home, and followed her in his car when she left.  The incident scared Ms. Johnson; she reported it to ADT.  [DE 5-17.]

56.    On June 5, 2014, Yvette Jordan, a 46-year-old ADT customer, was visited at her home in Cypress, Texas, by an unidentified AP agent wearing an AP shirt.  The AP agent falsely stated that he was "from ADT," and that he was visiting to replace Ms. Jordan's yard sign.  Because Ms. Jordan had an ADT alarm system installed only two months earlier, and was suspicious of the circumstances of the AP agent's visit, she told the AP agent to come back another time.  [DE 5-18.]

57.    On June 9, 2014, Robert Comolli, a 69-year-old ADT customer, was visited at his home in Fort Worth, Texas, by an unidentified AP agent.  The AP agent falsely stated that he was visiting to check Mr. Comolli's ADT alarm system, and to provide an upgrade.  The AP agent asked Mr. Comolli is he was having any problems with the ADT system.  The AP agent said that Mr. Comolli needed a new yard sign and a completely new alarm system.  The AP the agent also asked Mr. Comolli to "update" his contact information.  Mr. Comolli, surprised by the request for updated contact information, asked the AP agent to confirm he worked for ADT.  The AP agent said he worked for AP but that AP and ADT were "basically the same company."  Mr. Comolli asked the AP agent to leave.  [DE 5-19.]

58.    On June 24, 2014, William Horner, a 64-year-old ADT customer, was visited at his home in Mount Juliet, Tennessee, by an AP agent who identified himself as Ben Quinn.  Mr. Quinn falsely stated that he had been directed by the local Fire Marshall to replace Mr. Quinn's ADT alarm system to prevent false alarms. Mr. Quinn falsely stated that AP manufactured the ADT alarm equipment in Mr. Horner's home, and that

his visit was at ADT's direction.  Mr. Horner declined to sign an AP contract, even after

being told by Mr. Quinn that he would receive "free installation" of the upgrade only if

he took it immediately.  [DE 5-20.]

59.     On June 25, 2014, Barbara Perry, a 68-year-old ADT customer, was

visited at her home in Nashville, Tennessee, by an AP agent who identified himself as

Ben Quinn.  Mr. Quinn told Ms. Perry he was visiting to "upgrade" Ms. Perry's ADT

alarm system to a wireless unit.  Ms. Perry believed that Mr. Quinn was visiting as an

ADT representative, and signed an AP contract based on the deception.  [DE 5-21.]

60.     On or about June 17, 2014, Virginia Walker, a 72-year-old ADT customer,

was visited at her home in Waynesboro, Mississippi, by an AP agent who identified

himself as Skyler Newby.  Mr. Newby first visited Ms. Walker on November 21, 2013, to

inspect and upgrade Ms. Walker's ADT alarm system, claiming her system was

"outdated."  Ms. Walker declined Mr. Newby's first upgrade offer after Mr. Newby

admitted that he worked for AP, which Mr. Newby claimed to have started himself.   Mr.

Newby returned in June and attempted to convince Ms. Walker to switch from ADT to

AP, and attempted to enter Ms. Walker's home over her objections.  Ms. Walker ordered

Mr. Newby off of her property.  [DE 5-22.]

61.     On July 11, 2014, Arlene Miller, a 76-year-old ADT customer, was visited

at her home in Mabank, Texas, by an AP sales agent who identified himself as Ryan

Lyman.  Mr. Lyman wore GE insignia, told Ms. Miller that he was with GE, that he was

visiting to inspect her ADT alarm equipment, and that he would up grade her alarm.  Ms.

Miller understood Mr. Lyman to mean that he was was employed by GE, visiting at

ADT's request, and on that basis agreed to accept the upgrade.  Ms. Miller signed an AP

contract based on the fraud.  [DE 5-23.]

62.     On July 12, 2014, Christopher Bivens, a 54-year-old ADT customer, was

visited at his home in Arlington, Texas, by an AP agent wearing an AP shirt, whom AP

later identified as Wyatt Johnson.  Mr. Johnson stated, "I'm with your alarm company,"

and claimed to be visiting Mr. Bivens to offer new equipment.  When Mr. Bivens asked

Mr. Johnson about the AP trademark on a brochure, Mr. Johnson explained that AP and

ADT had merged into one company, and that AP handles equipment upgrades.  Mr.

Johnson also misrepresented the terms of the AP contract as a month-to-month

agreement, when in fact the contract has a 60-month term.  That discrepancy made Mr.

Bivens suspicious, and he refused to sign the contract.  Mr. Johnson then became "very

rude and arrogant," and told Mr. Bivens that he was "stupid and making a big mistake."

Mr. Bivens ordered Mr. Johnson off of his property.  [DE 5-24.]

63.     On July 16, 2014, M.J. Albright, a 66-year-old ADT customer, was visited

at her home in Marlin, Texas, by an AP agent who identified himself as Ryan Lyman.

Mr. Lyman asked to inspect Mr. Albright's ADT alarm system, then falsely stated that

the ADT system was "outdated" and no longer worked.  Ms. Albright signed an AP

contract based on the fraud.  [DE 5-25.]

64.     On July 16, 2014, Delphina Martinez, a 74-year-old ADT customer, was

visited at her home in Cleburne, Texas, by an AP agent who identified herself as Hillary

Winger.  Ms. Winger said she was visiting to "inspect" Ms. Martinez's ADT alarm

system and provide an "upgrade."  When Ms. Martinez saw the "AP" yard sign and asked

the AP agent and technician about whether they were working with ADT, AP agent

falsely stated, "it's the same company."  Ms. Martinez's daughter signed an AP contract

for Ms. Martinez based on the fraud.  [DE 5-26.]

65. On July 2, 2014, Dorthea Sanchez, a 65-year-old ADT customer, was

visited at her home in Texas City, Texas, by an AP sales agent who identified himself as

Wade Young.  Mr. Young said he was visiting to "change out" Ms. Young's ADT yard

sign and asked to inspect her alarm panel.  Mr. Young evaded Ms. Sanchez's repeated

questions about his affiliation, and at last identified himself as being with "AP and GE."

At that point, Ms. Alsobrook stopped the transaction and told Mr. Young to leave, despite

his repeated efforts to complete the sale, stating:  "I feel you were not completely honest

with me.  When you come to someone's home you should introduce yourself and your

company, and tell me it's something different from what I already have."  [DE 5-27.]

66. On September 1, 2014, Jackie Alsobrook, a blind 78-year-old ADT

customer, was visited at her home in Paris, Texas, by an AP agent who claimed to be

visiting to "upgrade" Ms. Alsobrook's ADT equipment. When, in a subsequent "welcome

call" with AP's office, the AP operator asked if Ms. Alsobrook understood that she was

changing alarm providers, the AP agent falsely stated that AP is "affiliated with" ADT,

and coached her to state to the AP operator that she agreed with the change.  Ms.

Alsobrook signed an AP contract based on the fraud.  [DE 5-28.]

67. On July 21, 2014, Gregory and Judy Cox, ADT customers, were visited at

their home in League City, Texas, by an unidentified AP agent.  The AP agent falsely

stated that AP had "bought out" ADT, and that he was visiting to "upgrade" their ADT

alarm system.  The Coxes signed an AP contract based on the fraud.  Two weeks later,

ADT called the Coxes and informed them that AP had not bought ADT.  When the Coxes attempted to cancel their AP contract, AP refused.  [DE 5-29.]

68.    On October 6, 2014, Covia Cunningham, a 66-year-old ADT customer, was visited at her home in Gadsden, Alabama, by an AP agent who identified himself as Skyler.  Skyler falsely stated to Ms. Cunningham, "I'm with ADT" and that he was visiting to provide an "upgrade" of her ADT alarm system.  Although Skyler wore an AP shirt, Skyler's false claim of affiliation with ADT misled Ms. Cunningham to believe that Skyler worked for ADT.  Skyler had the AP technician install an AP alarm system while he was still talking to Ms. Cunningham, before Skyler had obtained Ms. Cunningham's signature on a contract.  The installer, after the installation, explained to Ms. Cunningham that "Skyler is a fast talker."  [DE 5-30.]

69.    On October 16, 2014, Jessica Cobb, a 33-year-old ADT customer, was visited at her home in Hazel Green, Alabama, by an AP agent who identified himself as Keegan.  Keegan said that he was from AP, that AP is affiliated with ADT, and that he was calling to inspect Ms. Cobb's ADT alarm system on behalf of its manufacturer, GE.  Keegan opined that Ms. Cobb had "the most outdated version" of ADT's alarm equipment, and that it required an upgrade.  When Keegan did not answer her questions about his affiliations, Ms. Cobb grew suspicious and asked him to leave.  [DE 5-31.]

70.    On October 21, 2014, Patrick Johnson, a 60-year-old ADT customer, was visited at his home in Center Point, Alabama, by an AP agent who identified himself as John.  John said he was visiting to "upgrade" Mr. Johnson's alarm system, in such a way as to make Mr. Johnson believe he represented ADT.  Mr. Johnson saw the AP emblem on John's shirt but thought it "looked like the ADT logo."  Mr. Johnson declined the

upgrade because of the higher monthly rates John quoted for it.  Later, Mr. Johnson realized the two companies were different and reported the sales pitch to ADT because considered it misleading.  [DE 5-32.]

71.     On September 29, 2014, William Lipp, a 78-year-old ADT customer, was visited at his home in Birmingham, Alabama, by an AP agent who identified himself as Garrett Matthews.  Mr. Matthews said he was visiting to "upgrade" Mr. Lipp's alarm system, in such a way as to make Mr. Lipp believe that Mr. Matthews represented ADT. Mr. Lipp saw the AP emblem on Mr. Matthews' shirt but did not understand that Mr. Matthews was not an ADT representative, nor did he understand what Mr. Matthews meant when he said that he would cancel Mr. Lipp's ADT service.  Two months later, Mr. Lipp finally realized that he had been switched from ADT to AP, and tried to cancel his AP contract, but he could not afford the cancellation charge. [DE 72-1.]

### *2015 Customer Complaints*

72.     In early 2015, the defendants adopted the name Alder Home Security. ADT received reports of over 60 such instances in the first five months of 2015, and over 200 more in the twelve months since then.  The following are illustrations, again based on sworn declarations, that are drawn from these complaints.

73.     On February 4, 2015, Wulfrano Fernandez Jr., a 66-year-old ADT customer, was visited at his home in South Salt Lake, Utah, by an Alarm Protection agent named Corey Warren.  Mr. Warren told Mr. Fernandez that he was "connected" with ADT and was visiting to provide an upgrade of Mr. Fernandez's ADT alarm system.  Mr. Fernandez told Mr. Warren that he had just been discharged from the hospital, and was not able to focus on the transaction; Mr. Warren assured Mr. Fernandez that he would

"prepare all the paperwork" so that Mr. Fernandez would need only to sign his name where instructed. Mr. Fernandez did not realize that he had signed a new contract with a new alarm services provider until after the contract's three-day rescission period had lapsed. When Mr. Fernandez tried to cancel the contract, he was told that he was too late, and was bound by the contract. [DE 72-2.]

74.     On February 6, 2015, Betty Dawson, a 70-year-old ADT customer, was visited at her home in Carthage, Mississippi, by an Alarm Protection agent named Skyler. Skyler said he worked for "the same company" as ADT, and that he was visiting to upgrade Ms. Dawson's ADT alarm system. In fact, ADT had just upgraded Ms. Dawson's alarm equipment only four days earlier, on February 2. The agent instructed Ms. Dawson to sign "paperwork" to acknowledge receipt of the upgrade, and she did so. Later, upon examining the paperwork, Ms. Dawson noted that Skyler had written onto the contract: "I don't work for ADT." Ms. Dawson cancelled the contract. [DE 72-3.]

75.     On February 9, 2015, Odelia Ernest, a 59-year-old ADT customer, was visited at her home in Houston, Texas, by an Alarm Protection agent who identified himself as Eric Reguolcis. Mr. Reguolcis did not state his affiliation, and said he was visiting to upgrade Ms. Ernest's ADT alarm system. At the time of signing the contract, the agent showed Ms. Ernest his AP identification badge, but Ms. Ernest did not understand that the agent did not represent ADT until her husband reviewed the contract afterwards. The Ernests cancelled the AP contract. [DE 72-4.]

76.     On April 22, 2015, Cassandra McCall, a 47-year-old ADT customer, was visited at her home in Jonesboro, Georgia, by an unidentified Alarm Protection agent who wore no badges or emblems that disclosed his affiliation. The agent said he was

visiting to inspect and upgrade Ms. McCall's ADT alarm system.  After Ms. McCall

signed a contract, the agent disclosed his Alarm Protection affiliation, but explained that

Alarm Protection was "contracted by ADT to upgrade its alarm systems."  After Ms.

McCall had a chance to review the contract and understand that it was for alarm services

from a different company, she cancelled the contract.  [DE 72-5.]

77. On April 27, 2015, Bobby McLellan, an 84-year-old ADT customer, was

visited at his home in Montgomery, Alabama, by two unidentified AP agents.  The agents

wore street clothes and did not identify themselves as Alder agents.  Instead, they stated

that they knew that Mr. McLellan had an ADT alarm system, and that they were visiting

"to check [Mr. McLellan's] alarm equipment."  The two agents told Mr. McLellan that

his General Electric panel was "out of date," offered to replace it at no cost, and installed

a new Alder alarm system before presenting Mr. McLellan with an AP contract and

disclosing that they were Alder agents, not ADT agents.  [DE 72-6.]

78. On April 29, 2015, Rebecca McNutt, an 82-year-old ADT customer, was

visited at her home in Anniston, Alabama, by an Alder agent who identified himself as

John, without stating his Alder affiliation.  John said he was visiting to "upgrade" Mr.

McNutt's alarm system, in such a way as to make Ms. McNutt believe he represented

ADT.  Ms. McNutt saw the Alder name on John's shirt but thought it was the agent's

name, not a company name.  Ms. McNutt signed an AP contract and had an Alder system

installed in her home.  Once Ms. McNutt realized that Alder was a different company

from ADT, she cancelled her contract.  [DE 72-7.]

79. On May 13, 2015, Sheila Andrews, a 44-year-old ADT customer, was

visited at her home in Dawson, Georgia, by an Alder agent who identified himself as

Matthew Perry, without stating his Alder affiliation.  Mr. Perry stated:  "I work with ADT and I was sent to upgrade your alarm system."  In fact, Ms. Perry's ADT system was a new system installed only four months earlier, in January 2015.  Mr. Perry restated that he was sent by ADT, but declined to provide Ms. Andrews with a business card when she asked for one.  At Mr. Perry's insistence, Ms. Andrews signed an AP contract and permitted an Alder technician to install an Alder alarm system.  Once Ms. Andrews understood that she had signed a contract for new alarm services with another company, she cancelled the Alder contract.  [DE 72-8.]

80.     On May 19, 2015, Ruby Nelson, a 68-year-old ADT customer, was visited at her home in Weimar, Texas, by an Alder agent who identified himself as Kiet Tran.  Mr. Tran disclosed his Alder affiliation, but stated:  "We are taking over ADT.  I have some new upgrades to offer you."  Believing Mr. Tran's claim that Alder had acquired ADT, Ms. Nelson signed the Alder contract and allowed Alder technicians to install an Alder alarm system in her home.  Afterward, Ms. Nelson called ADT, learned that Alder had not acquired ADT, and cancelled her Alder contract.  [DE 72-9.]

81.     On May 19, 2015, R.L. Williams, a 76-year-old ADT customer, was visited at his home in Weimar, Texas, by an Alder agent who identified himself as Kiet Tran.  Mr. Tran disclosed his Alder affiliation, but stated:  "We took over ADT.  ADT is going bankrupt and we took over the company."  Believing Mr. Tran's claim that Alder had acquired ADT, Mr. Williams signed the Alder contract and allowed Alder technicians to install an Alder alarm system in her home.  Afterward, Ms. Nelson called ADT, learned that Alder had not acquired ADT, and cancelled her Alder contract.  [DE 72-10.]

82.     On May 22, 2015, Dorothy Reames, an 80-year-old ADT customer, was visited at her home in Bainbridge, Georgia, by an Alder agent who identified himself as Brady Nash. Mr. Nash told Ms. Reames that he was from a department of ADT that visits customers to inspect their equipment and change their batteries.  A technician with Mr. Nash removed Ms. Reames' ADT alarm equipment.  Mr. Nash told Ms. Reames to sign paperwork, which Ms. Reames believes was an acknowledgement for a new battery.  Mr. Nash then had Ms. Reames participate in a telephone call, and told her to answer each question "yes."  Ms. Reames obeyed both directions.  Once Ms. Reames understood that Mr. Nash had sold her a new alarm system, she cancelled her Alder contract and had her ADT equipment reinstalled.  [DE 72-11.]

83.     On June 16, 2015, Barbara Adair, a 75-year-old ADT customer, was visited at her home in Jayess, Mississippi, by an Alder agent who identified himself as Brady Nash. Mr. Nash told Ms. Adair that Alder was the company that protected her ADT alarm equipment, and that he was visiting to replace her equipment. Once Mr. Nash obtained Ms. Adair's signature, another Alder representative came and installed an Alder alarm system.  Once Ms. Adair realized that ADT had not sent Mr. Nash, she cancelled the Alder contract and arranged to have ADT reinstall her old system.  [DE 72-12.]

84.     On June 24, 2015, Hoyt St. Ama, an 81-year-old ADT customer, was visited at his home in Bacliff, Texas, by an Alder agent who identified himself as Kiet Tran.  Mr. Tran stated he was with "AD Security," and that he was visiting to evaluate and update Mr. St. Ama's ADT alarm system.  When Mr. St. Ama stated that he believed his current system was "pretty new," Mr. Tran replied, "we are constantly updating our equipment to keep it up to date."  Mr. Tran brought in a technician to install the

"upgrade" before Mr. St. Ama had signed a new contract.  Mr. Tran then had Mr. St. Ama participate in a telephone call in which the Alder operator asked whether Mr. St. Ama was aware that Mr. Tran was not affiliated with ADT.  Mr. St. Ama answered, "I do now," because he did not understand Mr. Tran's lack of ADT affiliation before the call.  Mr. St. Ama felt embarrassed that he had not known.  By the time his circumstances permitted him to try to cancel the Alder contract, the Alder contract's rescission period had expired and he was forced to cancel his ADT contract.  [DE 72-13.]

85.     On July 7, 2015, Armalyn Ann Thompson, a 75-year-old ADT customer, was visited at her home in Texas City, Texas, by an Alder agent who identified himself as Jacob Giles.  Mr. Giles stated he was with Alder, that Alder was affiliated with ADT, and that he was visiting to upgrade her alarm system to remove wires from the exterior of her house.  Ms. Thompson agreed to the "upgrade" because she understood Mr. Giles was affiliated with ADT and Mr. Giles had represented that her current equipment was inadequate.  Once ADT informed Ms. Thompson that Alder is not affiliated with ADT, Ms. Thompson cancelled her Alder contract and had her ADT system reinstalled.  [DE 72-14.]

86.     On July 13, 2015, Felicia Briggs, a 44-year-old ADT customer, was visited at her home in Bessemer, Alabama, by an unidentified Alder agent who said he was affiliated with ADT and the State of Alabama.  The agent said he was visiting to replace Ms. Briggs' outdated alarm panel, which he said could be disabled by cutting her phone line.  Ms. Briggs told the agent that the panel was a wireless model that ADT had installed only only three months earlier.  The Alder agent said he would return in a year.  Ms. Briggs called ADT and learned that Alder is not affiliated with ADT.  [DE 72-15.]

87.     On July 16, 2015, Mary McQuillen, an 85-year-old ADT customer, was visited at her home in Yoakum, Texas, by an Alder agent who identified himself as Aaron Kilgore.  Mr. Kilgore stated he was visiting to change Ms. McQuillen's yard sign and keypad.  Ms. McQuillen had been expecting an ADT service call the following week. When she asked Mr. Kilgore why he was visiting a week early, he did not answer. When Ms. McQuillen several times asked whether Alder was a division of ADT, Mr. Kilgore said, "We're just upgrading the keypad."  Ms. Thompson signed Mr. Kilgore's contract but she became worried about Mr. Kilgore's evasiveness regarding his relationship with ADT.  Upon further investigation, Ms. Thompson learned that Alder was not related to ADT and cancelled the Alder contract.  [DE 72-16.]

88.     On July 21, 2015, Shirley Jones, a 66-year-old ADT customer, was visited at her home in Yoakum, Texas, by an Alder agent who identified himself as Josh Dodd. Mr. Dodd stated Ms. Dodd's alarm system was missing a part and that he was visiting to upgrade her alarm system.  Ms. Jones allowed Mr. Dodd into her home believing him to represent ADT, and signed a contract that he presented.  Mr. Dodd disclosed that his technician would visit to switch her alarm system over from ADT to Alder.  Ms. Jones tried to rescind the contract a few days later but was unable to do so, and so cancelled her ADT contract.  [DE 72-17.]

89.     On August 11, 2015, Reginald Toussant, a 52-year-old ADT customer, was visited at his home in Galveston, Texas, by an Alder agent who identified himself as Taylor Byington.  Mr. Byington stated he was with Alder, and that Alder was working with ADT to inspect its customers' alarm equipment.  Mr. Toussant called Alder's

corporate headquarters, confirmed that Alder was not affiliated with ADT, and told Mr.

Byington to leave.  [DE 72-18.]

90.     On August 21, 2015, Shirley Frazier, an 81-year-old ADT customer, was

visited at her home in Savannah, Georgia, by an Alder agent who identified himself as

Sky.  Sky stated he was with ADT and visiting to install a new alarm system.  Ms. Frazier

allowed Sky into her home and signed the contract he gave to her.  Upon signing, a

technician came in and installed the new Alder system.  Sky had Ms. Frazier participate

in a call; Ms. Frazier could not hear the operator, but said "yes" each time Sky told her to

speak.  A few days later, Ms. Frazier realized that she had signed a contract with Alder,

that the rescission period had ended, and that she would have to pay Alder $2700 to

cancel the contract.  Ms. Frazier nonetheless cancelled the Alder contract, reported Alder

to the Better Business Bureau, and had her ADT equipment reinstalled.  [DE 72-19.]

91.     On November 5, 2015, Juliette Slaton, an 81-year-old ADT customer, was

visited at her home in Albany, Georgia, by Alder agent Jacob Dahl, a defendant in the

Prior Action.  Ms. Slaton had called ADT two days earlier to arrange a service call for

her alarm system.  When Mr. Dahl arrived, Ms. Slaton asked whether he was with ADT.

Mr. Dahl replied, "Yes, we are local."  Mr. Dahl removed Ms. Slaton's ADT alarm panel

and installed a new panel, connected to her existing alarm sensors.  Ms. Slaton signed

documents that Mr. Dahl presented, believing them to be a work order.  Once Ms. Slaton

understood that she had in fact signed a contract for alarm services with Alder, she

cancelled the Alder contract and had ADT reinstall her old alarm panel.  Had Ms. Slaton

known that Mr. Dahl was not from ADT, she would not have allowed Mr. Dahl into her

home.  [DE 72-20.]

### *The Complaints In Their Context*

92.     These reports are but the tip of the iceberg.  It is an accepted (and obvious) tenet of consumer complaint behavior that for every aggrieved customer who reports a deceptive sales practice, there are dozens more who go uncounted.  The customer declarations illustrate this point.  For example, the AP agent who visited Ms. Johnson stated he was upgrading all of her neighbors' alarm systems as well.  [DE 5-17, ¶ 6.]  Ms. Martinez reports that her AP agent claimed to have made sales calls to Mr. Martinez's neighbors, and that her brother-in-law, who lives a block away, was also visited by an AP sales agent using the same pitch.  [DE 5-26, ¶¶ 7, 22.]  Ms. Alsobrook realized that she had been "scammed" when her neighbor explained that she too had received the same false AP sales pitch.  [DE 5-28, ¶ 17.]  Ms. Cobb reports that the AP sales agent who called on her visited her brother-in-law's home as well.  [DE 5-31 at 2, ¶ 15.]

93.     At all times material to this action, defendants and their sales agents have tailored their sales pitches to confuse ADT's customers at the outset of their sales pitches in cold sales calls at the customers' doorsteps.  Defendants and their agents make false representations of affiliation with ADT to win the customers' interest and trust.  ADT's customers allow defendants' agents into their homes in the mistaken belief that they are speaking with a person affiliated somehow with ADT, visiting to provide the customers with goods and services related to their existing ADT alarm system.  But for this initial confusion, ADT's customers would not allow defendants' sales agents into their homes.  [*E.g.*, DE 72-20 at ¶ 18.]

94.     This confusion at the outset of a sale harms ADT by allowing competitors like defendants to freeride on ADT's goodwill with its customers to gain their attention

and trust.  Defendants' later efforts to "clarify" their lack of ADT affiliation does not cure the confusion that has already occurred at the outset of the transaction, even in those instances where a customer understands by the point of sale that she is contracting with defendants.  But in many instances the customer signs a contract with defendants in the mistaken belief that she is signing only a work authorization for the installation of ADT equipment by ADT or its affiliate.

**COUNT I**
**UNFAIR COMPETITION IN VIOLATION**
**OF THE LANHAM ACT, 15 U.S.C. § 1125(a)**

95.     Plaintiffs incorporate Paragraphs 1 through 94, as if set forth fully here.

96.     ADT US Holdings owns the ADT Trademarks.  ADT LLC uses the ADT Trademarks under license from ADT US Holdings.  Both are injured by any effort by defendants to confuse ADT's customers as to the affiliations of defendants' sales agents with ADT.

97.     Mr. Schanz directs and controls defendants' sales efforts.  Defendants, at Mr. Schanz's direction, train their sales agents to misrepresent themselves to ADT customers in the opening stages of a sales pitch.  Defendants and their agents use these false representations of affiliation to confuse ADT's customers as to the agents' true affiliation, to interest the customers in their pitches, to win the customers' trust, and to gain access to their homes.

98.     In fact, the defendants' sales agents do not represent ADT, nor are the defendants themselves affiliated with ADT.

99.     Defendants, through their respective sales agents, made these false representations to ADT's customers with the intent of deceiving ADT's customers as to a relationship or affiliation with ADT that does not exist, and that has never existed.

100.     These false and misleading statements are likely to confuse consumers regarding defendants' affiliation with ADT in the initial stages of a sale.  In fact, as documented in the referenced customer declarations, they already have created confusion among consumers, and will continue to do so if permitted to continue.

101.     Some ADT customers, initially confused at their doorsteps, eventually realize by the point of sale that the sales agents represent defendants, not ADT.  But many do not, remain confused at the point of sale, and sign contracts with defendants in the mistaken belief that they are contracting with ADT or one of its affiliates.

102.     The defendant AP sales entities and Alder Holdings have used these false sales pitches to sell alarm systems to ADT customers.

103.     AP LLC actively participated in these false and deceptive sales practices by licensing the AP name and trademark to the AP companies; by conducting "Welcome Calls" with prospective AP customers; by providing Clarification Questionnaires, contracts, and other materials for the AP sales entities to use; by controlling the cash of the AP Defendants; by controlling all relations with the vendors required to operate the AP alarm services business; and by providing operational, managerial, compliance and other services to the AP Defendants.

104.     Schanz, through Alder Holdings, AP LLC, Management and AP Holdings, controlled, directed, and actively participated in these false and deceptive practices, acting at all times in active concert with the AP Defendants in their efforts to confuse

consumers.  Schanz, Alder Holdings, AP LLC, Management and AP Holdings are also responsible for the torts of all the other defendants according to principles of agency or alter ego liability.

105.   ADT has been and will continue to be damaged as a result of defendants' false representations, by the confusion of the market for ADT's goods and services, by the disruption of ADT's relationships with its customers, by the diversion of ADT's customers to defendants, and by damage to ADT's goodwill and reputation as a reliable provider of security systems.

106.   ADT is entitled to an injunction pursuant to 15 U.S.C. § 1116(a) barring defendants from further violations of 15 U.S.C. § 1125(a).  Given defendants' disregard of its sales agents' false sales pitches, defendants are likely to continue to engage in such practices unless they are enjoined by this Court from further violations.

107.   ADT is entitled to an award of compensatory damages, as well as defendants' profits, attorney fees, and the costs of this action pursuant to 15 U.S.C. § 1117(a).  The court, pursuant the discretion confided to it under this section of the Act, should consider trebling these damages to compensate ADT fully for its losses.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against defendants, and award the following relief:

a.     An order pursuant to 15 U.S.C. § 1116(a) permanently restraining and enjoining defendants and their respective agents, servants, independent contractors, subsidiaries, affiliates, employees, officers, attorneys, successors and assigns, from falsely stating or representing, or training sales agents to state or represent, that:

(1) their agents are visiting from "the alarm company" or "the security company" without also specifying defendants' name in the same sentence;

(2) ADT is going out of business or is in financial difficulty;

(3) ADT does not exist;

(4) ADT is changing or has changed its company name;

(5) defendants have acquired, have merged with, have been taken over by, or are part of ADT;

(6) defendants are acting on behalf of, or are otherwise acting with the consent or approval of ADT;

(7) defendants are the "sister" companies of ADT;

(8) defendants manufacture the equipment used by ADT, or that defendants represent or are visiting on behalf of an alarm equipment manufacturer, including but not limited to General Electric and Honeywell;

(9) defendants are performing routine maintenance on the customer's ADT's equipment;

(10) any change proposed during a sales solicitation is an "update" or "upgrade" of the consumer's existing alarm system or alarm monitoring service agreement with ADT;

(11) an ADT customer's ADT security system is outdated or deficient;

(12) any enjoined party is "taking over' the monitoring of an ADT account or has purchased an ADT account from ADT;

(13) ADT is not, or has stopped, monitoring the alarm system for that person, residence, or business;

(14) ADT will no longer be able to monitor or service the alarm system for that person, residence, or business;

(15) any enjoined party is affiliated with, has the endorsement of, or is in any manner acting at the direction of any governmental or law enforcement agency without the prior approval of such governmental or law enforcement agency;

(16) statistics or other information is accurate which is known to be false or misleading, and which defendants have not made a reasonable effort to objectively quantify or substantiate; or

(17) any other false or misleading representation to current or former customers of ADT in the marketing or sale of an alarm system that defendants' sales agent knows to be false when made.

b.       Compensatory damages, in an amount to be found by the jury at trial of this cause, but believed to be no less than $7,000,000;

c.       An accounting of defendants' profits resulting from their deceptive practices, and payment of such profits to ADT;

d.       Attorney fees and costs incurred in the prosecution of this action, as provided by 15 U.S.C. § 1117(a); and

e.       Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT II
## <u>UNFAIR COMPETITION</u>

108.    Plaintiffs incorporate Paragraphs 1 through 94, as if set forth fully here.

109.    ADT and defendants compete for a common pool of customers.  Both market alarm services to the same target market of residential customers.

110.    Defendants have engaged in deceptive misconduct by training and directing its sales agents to use false sales pitches that are designed to mislead customers into believing that they are technicians or agents visiting at ADT's request to perform an inspection or upgrade of the customers' ADT alarm systems.

112.    Defendants train their sales agents to mislead ADT's customers by impersonating technicians visiting to provide an "upgrade" of the customers' existing ADT alarm services, when in fact they are visiting to tortiously interfere with ADT's contracts with its customers, and to install a new AP or Alder alarm system.

113.    Defendants' sales agents do, in fact, employ this misleading sales tactic, and use false sales pitches in the initial stages of a sales visit to confuse ADT's customers into believing the agent is with ADT, or working for an affiliate of ADT, or is visiting at ADT's request, when in fact the defendants' agent is an ADT competitor trying to steal customers from ADT.

114.    Defendants' interference with ADT's contractual relationships and use of false sales pitches is contrary to honest practice in industrial or commercial matters.

115.    Defendants' actions are likely to cause confusion among consumers, and in fact already have caused confusion, as demonstrated by the attached declarations, not only in the initial stages of their agents' sales pitches, but also at the point of sale.

116.    ADT has been injured as a result of defendants' actions.

117.    As alleged above, defendants' sales agents' false sales pitches at customer doorsteps are knowing and willful, and defendants have done nothing to restrain them. Accordingly, the Court should award punitive damages in an amount sufficient to deter defendants from continuing to engage in unfair competition in the market for electronic security services through their sales agents.

118.    ADT is entitled to injunctive relief pursuant to common law for defendants' ongoing use of false sales pitches.  Given the ongoing nature of defendants' misconduct, defendants are likely to continue to engage in such practices unless this Court takes appropriate measures to enjoin further violations.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against defendants, and award the following relief:

a.    An order permanently restraining and enjoining defendants and their respective agents, servants, independent contractors, subsidiaries, affiliates, employees, officers, attorneys, successors and assigns, from falsely stating or representing, or training sales agents to state or represent, that:

(1) their agents are visiting from "the alarm company" or "the security company" without also specifying defendants' name in the same sentence;

(2) ADT is going out of business or is in financial difficulty;

(3) ADT does not exist;

(4) ADT is changing or has changed its company name;

(5) defendants have acquired, have merged with, have been taken over by, or are part of ADT;

(6) defendants are acting on behalf of, or are otherwise acting with the consent or approval of ADT;

(7) defendants are the "sister" companies of ADT;

(8) defendants manufacture the equipment used by ADT, or that defendants represent or are visiting on behalf of an alarm equipment manufacturer, including but not limited to General Electric and Honeywell;

(9) defendants are performing routine maintenance on the customer's ADT's equipment;

(10) any change proposed during a sales solicitation is an "update" or "upgrade" of the consumer's existing alarm system or alarm monitoring service agreement with ADT;

(11) an ADT customer's ADT security system is outdated or deficient;

(12) any enjoined party is "taking over' the monitoring of an ADT account or has purchased an ADT account from ADT;

(13) ADT is not, or has stopped, monitoring the alarm system for that person, residence, or business;

(14) ADT will no longer be able to monitor or service the alarm system for that person, residence, or business;

(15) any enjoined party is affiliated with, has the endorsement of, or is in any manner acting at the direction of any governmental or law enforcement agency without the prior approval of such governmental or law enforcement agency;

(16) statistics or other information is accurate which is known to be false

or misleading, and which defendants have not made a reasonable effort to

objectively quantify or substantiate; or

(17) any other false or misleading representation to current or former

customers of ADT in the marketing or sale of an alarm system that

defendants' sales agent knows to be false when made.

b.       Compensatory damages, in an amount to be found by the jury at

trial of this cause, but believed to be no less than $7,000,000;

c.       Punitive damages in a sum sufficient to deter defendants from

engaging in further deceptive sales tactics;

d.       Attorney fees and costs incurred in the prosecution of this action;

and

e.       Such other and further relief as the Court may deem appropriate

in the circumstances.

## JURY DEMAND

Plaintiff demands a jury trial of all facts triable to a jury.

Dated:  November 14, 2016                    Respectfully submitted,

/s/ C. Sanders McNew
_____
C. Sanders McNew
mcnew@mcnew.net
Florida Bar No. 0090561
McNEW P.A.
2385 NW Executive Center Drive, Suite 100
Boca Raton, Florida  33431
Tel:  (561) 299-0257
Fax: (561) 299-3705

-and-

Richard G. Sander (*pro hace vice*)
rsander@shb.com
Kali R. Backer (*pro hace vice*)
kbacker@shb.com
Eric J. Hobbs (*pro hace vice*)
ehobbs@shb.com
SHOOK, HARDY & BACON LLP
1660 17th Street, Suite 450
Denver, Colorado  80202
Tel:  (303) 285-5300

*Counsel for the Plaintiffs, ADT LLC*
  *-and- ADT US Holdings, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this fourteenth day of November, 2016, I caused a true and correct copy of the foregoing Third Amended Complaint to be served by CM/ECF on all parties listed to receive electronic service for this case, as listed below:

### CM/ECF Participants

Michael Marcil, Esq.
Jennifer Nicole, Esq.

s/ C. Sanders McNew
_____
C. Sanders McNew